IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 6:24CR00013-1 |
| ) | |
| JUSTIN TAYLOR, ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT JUSTIN TAYLOR'S SENTENCING MEMORANDUM AND REQUEST FOR SENTENCING VARIANCE

Defendant Justin Taylor, by and through undersigned counsel, respectfully submits this memorandum to provide information to assist the Court with fashioning its sentence in this case. Given all the relevant circumstances here, a sentence of probation or home confinement would be "sufficient but not greater than necessary" to comport with the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**Initial Statement Withdrawing Objections to Presentence Report**

Undersigned counsel initially submitted several legal objections to the calculation of the advisory Sentencing Guidelines. (PSR, Addendum.) After discussion with Mr. Taylor, those objections are withdrawn.[1] Mr. Taylor poses no objections to the facts stated or advisory calculations made in the presentence report.

---

[1] Undersigned counsel endeavored to inform the Assistant U.S. Attorney and Probation Officer of Mr. Taylor's decision to withdraw his objections a week in advance of the sentencing hearing in order to minimize any time or expense incurred by those parties or other government agents that might otherwise be required to address them.

## Governing Law

In such cases as *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court restored the district court's power to fashion a sentence tailored to the individual circumstances of the case and the individual defendant. The advisory Sentencing Guidelines "are not only *not mandatory* on sentencing courts; they also are not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original); *see also Rita v. United States*, 551 U.S. 338, 351 (2007). Other relevant factors in determining the appropriate sentence include "the nature and circumstances of the offense" and the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the need to advance sentencing purposes of punishment and deterrence, *id*. § 3553(a)(2), "the kinds of sentences available," *id*. § 3553(a)(3), "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," *id*. § 3553(a)(6), and "the need to provide restitution to any victims of the offense, *id*. § 3553(a)(7). Section 3553(a)(3) specifically "directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007).

The directive for this Court is to "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). A sentencing court must "consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support a sentence requested by a party," *Gall*, 552 U.S. at 49, including arguments that the Guideline sentence should not apply on general policy grounds, case-specific grounds, or just "because the case warrants a different sentence

regardless." *Rita*, 551 U.S. at 351. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

## Nature of the Offense and Characteristics of Defendant

Mr. Taylor pleaded guilty to, and he accepts full responsibility for, his crimes of conspiring to tamper with emissions monitoring devices and falsely failing to report related income on his tax returns. He is 31 years old. He has been married to his wife Jessica for eight years. They have three small children – two boys and a baby girl – all under the age of seven. He has lived in Toombs County, Georgia, for his entire life, like his parents and grandparents before him. He is, at core, a "doting and loving father" who "places high importance on spending time with his family and close friends."[2] Mr. Taylor is the sole source of financial support for his young family; his wife is a homemaker.

Even after the criminal charges were filed, Mr. Taylor maintained full-time employment as a mechanic installing and maintaining fueling systems at airports and other commercial locations. His bosses – who have employed him since he was a teenager – say that he is a "very valuable and reliable employee," an "exceptionally talented" mechanic with an "exceptional work ethic" who always "do[es] our jobs the

---

[2] Quoted information in this section is drawn from the letters in support of Mr. Taylor from Charles Nobles, Jeremy Joyner, and Billy Ragan, attached hereto as Exhibit 1.

right way," who they "would hire . . . again without hesitation." He is a "huge asset" who they "are proud to have . . . as part of our company, our family." Over a decade, he has risen to be the company's lead technician "in charge of all service calls, as well as handling major installations at fuel stations and airports across the Southeast."

One of their major customers, the manager of the Vidalia Regional Airport, praises Mr. Taylor's "reliability and dedication" and "completely trust[s] Justin to perform . . . work . . . not only critical to my airport but airports all over Georgia, South Carolina, North Carolina, and even Tennessee." He also praises Justin's "volunteer spirit" shown, among other ways, in the time and work Mr. Taylor donates at the airport in support of their community's biennial Onion Festival Airshow. Justin is "everyone's 'Go To' guy. If something needs doing, Justin is the one they call. And he gladly shows up and helps in any way he can."

### Need for Sentence to Reflect Sentencing Purposes

Mr. Taylor understands that punishment and deterrence are valid considerations for this Court in setting his sentence. However, several circumstances of Mr. Taylor's case demonstrate that these purposes may be justly served without the need for a prison term.

Mr. Taylor has no criminal history whatsoever – not even a speeding ticket. He does not, and has never, abused drugs or alcohol. He has never before encountered the criminal justice system, state or federal, and nothing in his past suggests any propensity to violate the law in the future. He has never served even a day in prison. ***Any*** sentence of imprisonment will operate here as a shock to Mr. Taylor's system

4

that he has never before experienced.  He has never been away from his wife and young children for any length of time – at most, he has been away a few days for his job.

Even without a term of imprisonment, the collateral consequences to Mr. Taylor from his conviction already operate as significant alterations to his life.  He will suffer the shame and stigma of being a federal felon, and he will find that core citizen rights that he has exercised – including the right to vote – are now closed to him.  Mr. Taylor is an avid outdoorsman and collector of firearms, and the loss of his Second Amendment rights alone amounts to a dramatic deprivation, one that he will forever attribute to his own critically bad decision to engage in illegal conduct.  Mr. Taylor additionally will be under immense financial pressures as a result of the restitution he owes to the Internal Revenue Service, a debt that he will need time and significant effort to pay off without outside assistance.  Each of these consequences serve the need to punish Mr. Taylor and to promote respect for the law.

How Mr. Taylor responded to the federal investigation demonstrates his understanding of the significance of his criminal acts and his efforts to turn away from them.  Mr. Taylor's home was searched by federal agents in January 2021. (PSR ¶ 8.)  ***For over four years now***, during the entire pendency of this investigation and case, Mr. Taylor has led a completely law-abiding life.  Early in this case, Mr. Taylor indicated to the government that he desired to plead guilty.  He waived indictment before a grand jury, he did not require the government to engage in any extensive discovery practice, and he filed no contentious motions.  He stood before this Court

and clearly and articulately admitted his guilt. He has taken every step requested of him by the probation office and the government since then, and he has followed every rule set for him by this Court during his pre-sentence release. Everything about his response to this case reflects that it was an aberrant step, not a stop on a path to being a career criminal. There can be no argument that Mr. Taylor presents any risk of recidivism, and the public requires no protection from any possibility that Mr. Taylor will commit future crimes.

## Kinds of Sentences Available

This Court possesses the ability to impose a wide range of sentences that can punish and deter Mr. Taylor beyond those that require a prison component. Mr. Taylor is eligible for a term of up to five years' probation (PSI ¶ 75; 18 U.S.C. § 3561(c)), and this Court can include as part of that term a requirement that he serve intermittent confinement (18 U.S.C. § 3563(b)(10) or home confinement (18 U.S.C. § 3563(b)(19) under strict conditions set by the Court. A period of probation coupled with home or intermittent confinement, instead of prison, would permit Mr. Taylor to continue to benefit society by working for the employers who value his expertise and work ethic, by supporting his young family financially and emotionally, and by permitting him the opportunity to repay his restitution debt to the government.

The Guidelines themselves recognize that a sentence other than imprisonment should be considered for offenders, like Taylor, who qualify for the zero-point offender reduction of U.S.S.G. § 4C1.1. "A departure, ***including a departure to a sentence other than a sentence of imprisonment***, may be appropriate if the defendant

received an adjustment under § 4C1.1 (Adjustment for Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." U.S.S.G. § 5C1.1, comment. n. 10(B). The crimes at issue here – tax evasion and tampering with emissions devices – are not crimes of violence. They also are less serious than many offenses within the broad category of federal felonies, as reflected by the lower maximum punishments established by Congress for those offenses (three years for tax evasion under 26 U.S.C. § 7206(1), and two years for tampering with emissions devices under 42 U.S.C. § 7413(c).[3]

**Sentencing Disparities**

The United States Sentencing Commission has created the Judiciary Sentencing Information (JSIN) platform, an online sentencing data resource specifically developed with the needs of judges in mind. JSIN provides access to sentencing data for similarly situated defendants that courts may consider when determining the appropriate sentence to impose under 18 U.S.C. § 3553(a).

Here, the JSIN data reflects that defendants whose guidelines are calculated under the two substantively relevant guideline sections at issue here (U.S.S.G. §

---

[3] All felonies, arguably, are serious offenses, so this Guideline provision – and the statute it is drawing from, 28 U.S.C. §994(j) – must refer to some smaller subset of crimes as "otherwise serious offense[s]." Certainly, Taylor's crimes are not "otherwise serious" in a way akin to crimes of violence. The only other example of which undersigned counsel is aware where federal law defines a "serious" offense is in the context of the Armed Career Criminal Act, which defines a "serious drug offense" as requiring, *inter alia*, a possible punishment "of ten years or more." 18 U.S.C. § 924(e)(2)(A). Taylor's crimes have a lower maximum punishment.

2Q1.2 and U.S.S.G. § 2T1.1), and who score similar total offense levels and criminal history as Taylor under those guidelines, often receive sentences that ***do not*** involve incarceration. For instance, of the 15 defendants sentenced from 2019 to 2023 across the United States with an identical total offense level (16) and criminal history score (I) as Taylor, and whose offenses primarily involved application of the tax guideline (U.S.S.G. § 2T1.1), more than half (9 of 15, 60%) received ***no*** jail time as part of their sentence. *See* Exhibit 2 (JSIN Results, §2T1.1, 16/I). Of the twelve defendants sentenced from 2019 to 2023 across the United States with a similar total offense level (15 or 17, versus Taylor's 16[4]) and identical criminal history score (I), and whose offenses primarily involved application of the environmental crime guideline (U.S.S.G. § 2Q1.2), five of those twelve (42%) received no jail time, and the rest received a minimal term averaging two or three months' imprisonment.[5] *See* Exhibit 3 (JSIN Results, §2Q1.2, 15/I and Exhibit 4 (JSIN Results, §2Q1.2, 17/I).

As one federal judge recently has remarked, in sentencing two defendants engaged in tampering with emissions control systems to probationary sentences:

> It's . . . relevant to the consideration of seriousness that, until recent times, violations [of] the Clean Air Act were apparently mostly enforced through civil fines and penalties. . . .
>
> When many business and individuals have received only civil fines and penalties and, others, misdemeanor convictions, the facts in

---

[4] JSIN reports an insufficient number of defendants with a primary guideline of 2Q1.2 and a total offense level of 16 for analysis.

[5] These results ***do not include*** defendants sentenced with a government motion for a reduction based on substantial assistance under U.S.S.G. § 5K1.1.

this case must be substantially distinguished to warrant significantly more severe punishment.

*See* Exhibit 5 (Excerpted Transcript of Nov. 4, 2024 Sentencing Hearing, *United States v. Coiteux*, CR21-05184-BHS-2 (W.D. Wash.)), at transcript pages 70-71. As that judge rightly recognized, companies and individuals engaged in environmentally harmful conduct that is by orders of magnitude more extensive than that at issue in Mr. Taylor's case have been permitted to resolve their cases through civil consent decrees and fines rather than face criminal felony prosecution and the possibility of prison time. Examples abound on the Environmental Protection Agency's "Civil and Cleanup Enforcement Cases and Settlements" webpage[6], including:

- **Turn 14 Distribution, Inc.,** one of the country's largest wholesale distributors of automotive parts and supplies, sold over 140,000 tampering devices throughout the United States that removed or defeated emissions controls. Resolved with civil consent decree and civil penalty in 2025. No criminal prosecution of company or any individuals.

- **Meyer Distributing, Inc.**, one of the largest wholesale distributors of performance automotive parts and supplies in the United States, sold over 90,000 aftermarket defeat devices. Resolved with civil consent decree and civil penalty in 2025. No criminal prosecution of company or any individuals.

- **COBB Tuning Products, LLC,** a Texas manufacturer of aftermarket automotive parts, sold over 81,000 "tuners" that change the computer programming inside of a motor vehicle in a way that disables emissions controls. Resolved with civil consent decree and civil penalty in 2024. No criminal prosecution of company or any individuals.

- **Cummins Inc.** equipped 630,000 model year 2013-2019 vehicles with illegal software defeat devices that reduced the effectiveness of the emission control system and failed to disclose that an additional 330,000 vehicles included auxiliary emission control devices that affected those systems.

---

[6] *See* www.epa.gov/enforcement/civil-and-cleanup-enforcement-cases-and-settlements.

9

- Resolved with civil consent decree and civil penalty in 2024. No criminal prosecution of company or any individuals, despite the fact that Cummins had similar civil settlements with the United States in 2010 and 1998 for similar unlawful conduct.

- **Xtreme Diesel Performance, LLC**, manufactured and sold at least 27,000 aftermarket defeat devices between 2015 and 2017. Resolved with civil consent decree and civil penalty in 2021. No criminal prosecution of company or any individuals.

- **Gear Box Z, Inc.,** a "small company based in Colorado City, Arizona," manufactured and sold at least 8,300 aftermarket defeat and devices – and *even refused to stop selling those devices after confronted by the government*. Resolved with company and its owners through civil consent decree and civil penalty in 2021. No criminal prosecution of company or any individuals.

- **Advanced Flow Engineering, Inc.** sold at least 63,000 aftermarket defeat devices for diesel and gas engines between 2014 and 2021. Resolved with civil consent decree and civil penalty in 2021. No criminal prosecution of company or any individuals.

- **Punch It Performance and Tuning and owner Michael Schimmack** manufactured and sold more than 20,000 aftermarket defeat devices, and hid the fact that they continued to do so even after contact with the federal government by dissolving and restarting the company under a new name and fraudulently transferring assets. Resolved through civil complaint with company and individuals and civil penalty in 2020. No criminal prosecution of company or any individuals.

- **Derive Systems, Inc.** manufactured and sold approximately 363,000 custom "tuning" software packages designed to access and overwrite emissions control programs. Resolved with civil consent decree and civil penalty in 2018. No criminal prosecution of company or any individuals.

The limited available examples of criminal prosecution of crimes like Taylor's have never resulted in the sort of prison sentence contemplated by the advisory

guideline range here. The recent cases reported on the Environmental Protection Agency's "Criminal Press Releases" webpages[7] include the following examples:

- **Kyle Offringa** conspired to tamper with emissions controls systems in "numerous diesel vehicles" from referrals from a complicit diesel parts supplier, earning $1,000 to $1,500 per vehicle. Sentenced to **a $100,000 fine (no term of probation)**, in March 2025 by a federal judge in the Northern District of New York.

- **Leon Martin**, a mechanic who worked at a diesel repair shop in Pennsylvania, provided "tuning" or "reprogramming" services on emissions control systems in diesel trucks throughout a five-year period from 2018 to 2023. Sentenced to **two years' probation** in March 2025 by a federal judge in the Middle District of Pennsylvania.

- **Ryan Lalone, Wade Lalone, and James Sisson**, owner and employees of Diesel Freak LLC, conducted remote reprogramming, tuning, and deletion of emission control systems that amounted to 70% of their company's business from 2015 to 2018. Each individual was sentenced to **one year probation** in February 2024 by a federal judge in the Western District of Michigan.

Other recent criminal resolutions ending in a probated sentence are listed in connection with parallel civil resolutions on the EPA's "Civil and Cleanup Enforcement Cases and Settlements" webpage, discussed *supra*, including:

- **Rudy's Performance Parts and owner Aaron Rudolf** manufactured and sold over 250,000 parts for diesel pickup trucks designed to remove emission controls and installed hundreds of such devices in Rudy's garages. Parallel civil and criminal resolution. Rudolf received a sentence of **three years' probation** in 2024.

- **Power Performance Enterprises, Inc., and owner Kory Blaine Willis** manufactured and sold at least 59,135 electronic tunes or tuning devices that disable emissions control systems on diesel pickup trucks and marketed and sold numerous other devices designed to disable or bypass

---

[7] These pages include www.epa.gov/enforcement/criminal-press-releases-2025, www.epa.gov/enforcement/criminal-press-releases-2024, and www.epa.gov/enforcement/criminal-press-releases-2023.

11

emissions systems. Parallel civil and criminal resolution. Willis received a criminal sentence of **three years' probation**, including ten months' home detention, in 2022.[8]

Other examples can be found in Department of Justice press releases posted online, including the Coiteux case that was the source of the district judge's Clean Air Act comments discussed *supra*:

- **Tracy and Sean Coiteux**, the owners of automotive businesses in Clark County, Washington, removed emissions controls from 375 trucks and turned their profits into a "10-acre compound with a saltwater pool and garage housing an extensive collection of expensive exotic cars." Sean pleaded guilty; Tracy was found guilty after a three-day trial. Both received a sentence of **four years' probation including four months' home confinement** in November 2024.[9]

Criminal cases even more closely related to this one have resulted in minimal prison sentences. In February 2025, a federal judge in Washington sentenced **Jonathan Achtemeier** to four months in prison for his conspiracy to violate the Clean Air Act. *See* Exhibit 6 (DOJ Achtemeier Press Release). Achtemeier advertised his services on the internet and was able to tamper with emissions control systems remotely, altering hundreds of vehicles and grossing $4.3 million from his expert services from 2019 and 2021. Achtemeier, through a website he operated with national reach, repeatedly sold Mr. Taylor the computer programs or "tunes" that Mr. Taylor uploaded into vehicles to alter emissions control programs. (PSR ¶ 39.) Mr.

---

[8] *See also* "United States v. Power Performance Enterprises, Inc., et al.," United States Department of Justice, Environmental and Natural Resources Division, www.justice.gov/enrd/case/united-states-v-power-performance-enterprises-inc-et-al.

[9] *See* www.justice.gov/usao-wdwa/pr/owners-clark-county-automotive-repair-and-performance-shop-sentenced-home-confinement.

12

Taylor is not alleged to have created, and did not create, and did not know how to create those programs. To make an imperfect analogy to drug conspiracies, Achtemeier was a (more culpable) manufacturer and distributor of illegal products, one that possessed technical knowledge of and control over its production; Mr. Taylor was the street-level seller.

As far as undersigned counsel can tell, the most jail time that anyone in the United States has *ever* received for conduct similar to Mr. Taylor's – that is, tampering with emissions devices and related tax evasion – is a year and a day in prison. That was the sentence imposed on Matthew Geouge by the United States District Court for the Western District of North Carolina in 2021. *See* Exhibit 7 (DOJ Geouge Press Release). Geouge's case, though similar on the surface to Mr. Taylor's, is significantly worse by every important metric. Geouge was involved in criminally altering and deleting emissions control systems for ***six years' longer*** than Mr. Taylor. Geouge sold ***14,000*** defeat devices, versus 200 or so by Mr. Taylor. Geouge ***created, designed, and wrote the computer programs*** that were designed to defeat emissions systems; Mr. Taylor never did that and never had the capability to do that. Geouge cheated the Internal Revenue Service out of ***$1.2 million*** in taxes, vastly more than Mr. Taylor. And, most importantly, ***Geouge was specifically notified by the EPA as early as 2015*** that he was violating environmental laws, and he nevertheless ***continued for years thereafter*** to sell and service illegal tuning devices, all the while evading assessed EPA penalties by hiding his income through a third-party fraud. Mr. Taylor, by contrast, ceased his illegal activity

13

forever upon the first contact he ever received from any federal agency. The proper comparator sentence from Geouge's case to this one is not Geouge himself; rather, it is Geouge's three co-defendants, all of whom had more limited involvement, and all of whom received probated sentences.

## Conclusion

The factors discussed herein, and those that additionally may be raised at the sentencing hearing, demonstrate that the advisory Guidelines sentence is far in excess of that necessary to accomplish the 18 U.S.C. § 3553(a) purposes of sentencing. This Court should exercise its reasoned mercy and downwardly vary to a sentence of probation or home confinement.

Respectfully submitted, this 12th day of April, 2025.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

By:   /s/ R. Brian Tanner
         R. Brian Tanner
         Georgia Bar No. 697615
         btanner@griffindurham.com
         122 E. 38th Street
         Savannah, Georgia 31401
         Ph/Fax: 912-867-9140

*Attorney for Defendant Taylor*

## **CERTIFICATE OF SERVICE**

On this date, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This 12th day of April, 2025.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

By: /s/ R. Brian Tanner
R. Brian Tanner
Georgia Bar No. 697615
btanner@griffindurham.com
122 E. 38th Street
Savannah, Georgia 31401
Ph/Fax: 912-867-9140

*Attorney for Defendant Taylor*